# EXHIBIT 13

CLO

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SADIS & GOLDBERG, LLP,
              Plaintiff,

v.                                                          Case No. 1:14-CV-913 (LTS)

SUMANTA BANERJEE,

              Defendant.

SCANNED

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION IN OPPOSITION OF VACATING OR SETTING ASIDE DEFAULT

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ___63___
DATE FILED: 8-10-16

Respectfully Submitted,
SUMANTA BANERJEE

*Pro se Litigant*
*58/1 Ballygunje Circular Rd*
*Kolkata-19*
*West Bengal*
*India*
*Email: zbacllc@gmail.com*



1

## Table of Contents

PRELIMINARY STATEMENT AND FACTS ............................................................... 4-16

SUPPORTING MEMORANDUM OF LAW ....................................................... 17-33

2

## PRELIMINARY STATEMENT AND FACTS

Pursuant to Fed. R. Civ. P. 60(b), Defendant Sumanta Banerjee, a US citizen and a resident of India with an address of 58/1 Ballygunje Circular Rd, Kolkata -19, respectfully asks that the Court vacate the Default Judgment as void and set aside entry of default.

Mr. Banerjee is not a PA resident and cannot meet any of the requirements of PA residency.  He did maintain a house in Connecticut when his family was in India starting 2009 till 2015 when it was sold.  However, the house was on the market for sale from 2012 onwards and used it as needed for work purposes when he was in the area.  As a result, Mrs. Banerjee wrote to the Court and gave Mr. Banerjee's permanent address in India in November 2013.

Mr. Banerjee found out about this current lawsuit and default judgment from a friend and went into the PACER system to extract all the specious claims of Mr. Douglas Hirsch ("Hirsch" or the "Plaintiff") and Sadis & Goldberg ("Sadis" or the "Plaintiff").  Mr. Banerjee is appearing *pro se* in the interest of time and has not had time to obtain legal representation.

Mr. Banerjee would respectfully submit that both Service of Process and the entry of the Default Judgment violated the Hague Convention.[1] The Default Judgment should also be vacated under Rule 60(b)(1)(2)(3) or Rule 55(a) for good cause. Additionally, the declaration from the Plaintiff, Sadis & Goldberg ("Sadis" or "Plaintiff") stating that Mr. Banerjee is in receipt of the Summons, Complaint and Judgment is clearly a blatant attempt to mislead this Court and violation of  FRCP Rule 4. He has yet to be served either under the Hague Convention Rules or under FRCP Rule 4. The email that the Plaintiff claims to have served pursuant to FRCP (4)(f) (3) has not been used for the purposes of communication

---

[1] The standard for setting aside the entry of default is lower than that for vacating a default judgment. *Brand Scaffold Builders, Inc. v. Puerto Rico Elec. Power Auth.*, 364 F. Supp. 2d 50, 54 (D.P.R. 2005). Accordingly, if the Court vacates the Default Judgment, Mr. Banerjee asks that it also set aside the entry of default. The Articles of the Hague Convention are found in Exhibit B, annexed hereto.

3

since early 2013. As a matter of fact and contrary to Sadis' spurious claims, the Massachusetts court used gandhibanerjee@gmail.com for the duration of the case, 12-cv11643(LTS), please see exhibit A. Sadis intentionally misled the Court by stating that Mr. Banerjee used the "sbaner" email, whereas the docket page of the PACER system clearly states that the email address of Mr. Banerjee to be gandhibanerjee@gmail.com. The Court in its Memorandum & Order dated July 2014 allowed service under FRCP (4)(f)(3) and allowed service to email used in the Massachusetts Courts recently (ongoing matter). In that case 12-cv-11643 (LTS), the email, gandhibanerjee@gmail.com was on the docket sheet and NOT the sbaner@gmail.com as Sadis claims falsely and misled the Court leading to default judgment. Mr. Banerjee would have seen the Service of Summons and Complaint since the email is active.

Furthermore, the claims are meritless and baseless since a pledge mechanism was agreed upon as part of July 2008 Agreement, please see exhibit C, in which the Plaintiff was expected to foreclose on Pledge Collateral (Mr. Banerjee's converted GP interest is worth many multiples of the Sadis Invoice as of January 31, 2009). This mechanism was built into the July 2008 Agreement after extensive verbal negotiations since Mr. Banerjee complained about the "inflated bill" of $249k when Hirsch had estimated about $100k (exhibit xx).   The July 2008 Agreement was supposed to "settle" the invoice, avoid any lawsuit and "zero out" the Invoice when the Collateral (converted GP interest of GDF Fund into special LP interest) paid cash to the Plaintiffs at or near the end of the Term of the GDF Fund where Mr. Banerjee was a 50% member of the General Partner.  Plaintiff never foreclosed on the collateral (via either Pledge Agreement or Assignment Agreement) that was agreed upon in the July 2008 Agreement and chose instead to materially breach the July 2008 Agreement and waste the Courts' time with this frivolous and meritless lawsuit.

## FACTS

### Sadis Retainer and The July 2008 Agreement

1. Banerjee and Tuckerbrook Alternative Investments, LP ("TB") had launched two funds in 2007, TB|SB Global Distressed Fund ("GDF") and TB|SB Global Special Situations Fund ("GSF"). TB

4

and Banerjee were 50-50 partners of the General Partner and Banerjee was the 50% managing member of the two funds. Due to various disagreements with TB, Banerjee approached Sadis to resolve the issues between the two partners.

2. Mr. Banerjee hired Ron Geffner ("Geffner") a partner of Sadis & Goldberg ("Sadis" or "Plaintiff") in December of 2007 to aid him in negotiating contracts with TB.

3. Ron Geffner's "incompetence" and desire to enrich the firm forced Mr. Banerjee into a legal battle for control of the Funds that Mr. Banerjee managed ($125MM). As a result of the poor advice and the firm's greed on the part of Geffner to push the matter into litigation, TB filed a lawsuit in March 2008 against Mr. Banerjee. Due to Banerjee's complaining of Geffner's handling of the case, Sadis gave Banerjee a $5,000 discount that was reflected in the July 2008 Agreement.

4. It is evident from this discount, that Sadis acknowledged that Geffner's mishandling of the matter. The lawsuit that began in March of 2008 was a direct result of Hirsch's desire to litigate rather than negotiate an amicable solution between Mr. Banerjee and TB. Hirsch was well aware that Mr. Banerjee had no experience with litigation and used that advantage to "bully" Mr. Banerjee into a lawsuit rather than settle the disagreements amicably. When Banerjee asked what the anticipated cost of litigation might be Hirsch told Mr. Banerjee that he anticipated a total expense of around $100k see exhibit xx.

5. As a result of Sadis & Goldberg's "tactics" of asking Mr. Banerjee to reject "standstill agreement" and various settlement options floated by TB, Hirsch "pushed" Mr. Banerjee into the lawsuit. Several settlement options were floated which Mr. Banerjee was ready to accept but Sadis, in their greed, strong- armed Mr. Banerjee to reject these options and threatened to quit if Mr. Banerjee settled. Mr. Banerjee, being a first time litigant unfortunately did not know better and listened to the poor advice from Mr. Hirsch and Sadis.

6. Mr. Banerjee protested of the "padding of the bill". Due to Hirsch's incompetence, poor advice, unethical behavior of blatant padding, Mr. Banerjee's legal fees grew astronomically from an estimated $100,000 (please see exhibit D, email which acknowledges that he said that it would be

5

roughly $100k) to nearly $500,000 (nearly 5x the amount estimated).  Mr. Banerjee, being a first-time litigant was forced into entering into the July 2008 Agreement where he had to agree to their fees by pledging his converted GP interest. (please see exhibit E showing the LPA from GDF fund)

7.   July 2008 Agreement was a contract signed by both parties after extensive negotiation where Mr. Banerjee agreed (1) not to challenge the "grossly padded bills" of Mr. Hirsch to the tune of $249k and (2) he had to agree to any settlement which the Plaintiff was able to negotiate. In return, Banerjee was going to "pay" Sadis with his "converted GP interest" as interpreted in the Limited Partnership Agreement ("LPA") of SB/TB Global Distressed Fund (GDF). This was the contract/agreement that both parties agreed to in July 2008 and both parties benefitted from the agreement- Hirsch got paid his "inflated" padded bill and could force Banerjee in accepting any settlement (even if it was to Banerjee's detriment) and Banerjee could defer payments and could assign his 50% interest in the converted GP interest into Special LP interest.

8.   The July 2008 Agreement is attached hereto as Exhibit C. As the Court can see the second page contemplates how the pledge agreement will be used to "settle and zero-out" the amount that Banerjee owes to the Plaintiff.

> Finally your signature below will acknowledge that you will enter into an agreement that you *__will pledge your converted GP interest into limited partnership interest in GDF as collateral__* for any outstanding legal fees owed, should you fail to zero out your balance on or before September 30th 2008. **We will forward you a *pledge agreement* at that time for review by your personal counsel. The pledge agreement shall provide that Sadis & Goldberg LLP cannot foreclose on the interest until January 31st 2009. [emphasis added]**

9.   Hirsch intentionally missed deadlines agreed upon in the July 2008 Agreement and the pledge agreement was never sent in the period specified, Sept 30, 2008-Jan 31, 2009. Additionally, the foreclosure agreement was not entered into by Jan 31, 2009 nor was it ever sent.  This was a **first material breach of contract where timelines contemplated in the July 2008 Agreement were breached by the Plaintiff.** Please see exhibit F.

10.  Hirsch finally contacted Banerjee in April of 2009 and shortly thereafter sent over an assignment agreement where he intentionally tried to "grab" Banerjee's personal Limited Partnership interest

6

and not to the previously agreed upon (in the July 2008 Agreement) converted GP interest in the GDF Fund. The documents Hirsch sent in April 2009, he erroneously (or intentionally) called the Fund "Global Special Situations" (another Fund Mr. Banerjee managed) when in fact it should have been GDF (as per July 2008 Agreement).  See exhibit G (Assignment Agreement for GSS) & exhibit J. (email conversation that acknowledges that Hirsch cannot have the LP interest).

11. Mr.Banerjee pointed out the errors and asked for the corrected version.  Hirsch's pattern of delay for a simple document assigning Mr. Banerjee's interest in a GP vehicle owned jointly by him and TB took another three months to August 10th to change the name of the Fund from "GSS" to "GDF" and it seems that Hirsch did not want the converted GP interest (special LP Interest) solely, but also made a "grab" for Mr. Banerjee's separate personal LP interest in GDF. This was **a material breach of contract** of the July 2008 Agreement and Hirsch was using his position as a litigator to threaten Banerjee to compel him sign the document. Please see document attached as exhibit H.

12. Banerjee immediately protested the inclusion of his personal LP interest but Hirsch was trying to use the "bully" tactics to force Mr. Banerjee to agree to giving him the LP interest as well or else he would sue him. Please see exhibit I, email exchange.

13. Hirsch refused to listen to Mr. Banerjees protests and threatened to sue him if he does not assign over the personal Limited Partnership Interest which Mr. Banerjee refused to do since it was in his retirement account and it was never part of the July 2008 contract.  Hirsch re-iterated that he would send a revised agreement/MOU where all the payments would be sent to Hirsch. See Exhibit K (assignment agreement still showing LP interest and Special LP interest in material breach of July 2008 Agreement). He sent the agreement on or around September 22, 2009. However, he still refused to remove the personal LP interest but removed GP approval requirement.

14. Around mid-October, Mr. Banerjee spoke to Mr. Hirsch and told Hirsch that the LP interest was off limits (besides it is held in a retirement account) and he need to change the assignment

7

agreement to the collateral agreed upon i.e. converted GP interest only and not the LP interest. Please see Exhibit J.

15. Mr. Hirsch, being a "crooked" lawyer and Sadis being a "crooked law firm", seem to be intent to "disavow" the Pledge Agreement since it was not signed. However, the July 2008 Agreement was a contract with all elements of a contract/contract law having been satisfied. There are several emails that show Hirsch intentionally materially breached the contract by sending various "incorrect" agreements (in material breach of July 2008 Agreement) and then just disappeared after sending the email below on October 15, 2009. See attached email L.

16. The Honorable Court hopefully can clearly see through Hirsch unethical conduct by sending various "incorrect assignment agreements" and then disappearing for **FOUR years** before filing this lawsuit.  He had no intention to ever execute a pledge agreement and foreclose and comply with the July Agreement. The July Agreement was a contract where Banerjee agreed to the inflated bill and the "settlement" with Tuckerbrook based on the July Agreement but Hirsch violated the terms of the Pledge mechanism which was agreed upon.  Hirsch materially breached the July 2008 Agreement/contract and as a result the contract should be null and void. Mr. Banerjee is the non-breaching party.

17. Hirsch's intention it seems, was to never really sign an agreement (as it was originally contemplated by the two parties). This is clear from the Plaintiff's conduct from Sept 30, 2008 to January 31, 2009 when he never sent Pledge/Agreement or a simple agreement to assign Mr. Banerjee's interest in the converted GP interest to Sadis.   This was not subject to GP approval as shown in the LPA of GDF. (please see exhibit E)

18. Mr. Banerjee has shown the Court that he has a meritorious defense and counterclaim since as a result of the material breach by SG, the July 2008 would be null and void.  Mr. Banerjee would have never agreed to the bill had it not been for the Pledge mechanism of the Special LP Interest of GDF which he could assign to the Plaintiff.

8

19. **Email exchanges between Mr. Banerjee and Mr. Hirsch show Mr. Hirsch's material breach of the July 2008 Agreement in which Mr. Banerjee agreed to the "inflated bills" and they kept on getting padded to the tune of 5x the original estimate of 100k by Mr. Hirsch.**

**April 21, 2009**
Hirsch to Banerjee---"Sam, I need to speak with you. I want to get your interest in the GDF Fund assigned to us and have them make the distributions to us as per our agreement. Please call me. Thank you.

**July 21, 2009**
Hirsch to Banerjee--.....
However, if and when we receive assignment of the GP interest, it does not "settle" the bill. Once we are paid in full, from proceeds of the GP interest, or otherwise, will the bill be settled.

I will work on finalizing the assignment paperwork with you in the next two weeks.

**August 30, 2009,**
**Sam to Hirsch:-**You are completely clueless as to our arrangement. What has been agreed to in July will be honored. Period!! Nothing more nothing less!! FYI- I am not collecting anything on my personal LP investment since no realizations can take place.

The GP interest has been converted into LP interest and that is what was assigned to you (pls refer to July agreement). So I will make the requisite edits (which I had in my last draft) and send it back to you. ... This is what we had spent hours negotiating and I am not negotiating anything new. The Agreement in July will be honored.

**August 31, 2009 5:53pm**
**Banerjee to Hirsch:** No-you have already foreclosed on it. I get that completely. I need a doc from you that is an MOU of the arrangement you suggested. The Distressed GP will direct the CF to you till 350k+ whatever you bill now for Dep stuff is paid, OK?

**Sept 1, 2009:**
**Banerjee to Hirsch**----I have not seen anything from you. Please send me the doc that directs the cash flows to be paid to you. I will take it to Alkek. Thx

**Hirsch to Banerjee**---I have to draft it and I am on vacation. In the meantime, send me Scott's phone number so that I can get the info I need.

**Oct 15, 2009:**
**Banerjee to Hirsch** ---See attached. I was trying to get you the benchmarks-- hence it took time. I could not locate them. Anyway, the Funds performance is in the top quintile for similar funds. Also, keep in mind that valuations in PE land (FOF) are mostly one quarter lag --- in other words the valuation is for March 2009. So the market rally from March 2009 onwards is not reflected in the numbers.

9

I thought you were supposed to send me the revised agreement -- have not received it yet. [Emails attached as Exhibit N]

**Hirsch to Banerjee**-- Thanks. There is **no revised agreement** because I have to look at the statements and figure out what if anything we can work out.(emphasis added)

The communication of Oct 15, 2009, was the last email GP interest into special LP interest to

Hirsch.

20. Mr Banerjee has demonstrated his responsibility with regard to paying fees owed to the Plaintiff while the Plaintiff seems intent on trying to re-negotiate the terms of the contract; a material breach. The Plaintiff acted in bad faith and continues to do so while Mr. Banerjee stood ready and willing to sign any agreement that matches the letter of the original contract, the July 2008 Agreement.

21. The next time Hirch and Banerjee communicated is in January of 2013 briefly on another matter. The Court will no doubt find it strange that after so many communications between the Plaintiff and Mr. Banerjee, that Hirsch suddenly goes silent on his demands for payment. When Mr. Banerjee spoke to Hirsch on an unrelated matter, in January of 2013- **a gap of more than 4 years,** he again reminded Hirsch that Hirsch had not sent over any paperwork on the "assignment" or the "payment arrangements". Instead of sending over the agreement as was contemplated in 2008, Hirsch preferred to start a meritless, frivolous lawsuit rather than simply executing the agreement that both parties had agreed to. *After the initial 4 years*, Hirsch finally "woke up" to file a lawsuit like he "woke up" after three months to reply to the Motion for Vacating Default.

*Hague Convention; Service of Process, email Service and Banerjee's residency*

22. In January of 2009, Mr. Banerjee and his family moved to India while maintaining their house in CT. Although they owned the Connecticut house, they had transferred their residency to India, obtaining a residence, housing, a car and placing their children into school in India. Despite the fact that initially, Judge Young had ruled against Mr. Banerjee, Judge Young overturned the default verdict when Mr. Banerjee was able to demonstrate that he had not avoided service and

10

was able to demonstrate that he had a meritorious defense contrary to the "clever" and specious drafting by Plaintiff. Again the Plaintiff has misstated the facts for the purpose of trying to "pull the wool over the Court's eyes." Mr. Banerjee himself contacted Judge Young's court for the purposes of answering the complaint. Furthermore, Judge Young's clerk communicated with Mr. Banerjee through Mr. Banerjee's wife's email. (see exhibit A).  Please see Exhibit O for Judge Young's Memorandum and Order vacating Default Judgment.

23. When Mr. Banerjee moved to India in 2009, he established his residency by buying a car, maintaining a house, obtaining a drivers' license, setting up an investing and consulting business and establishing bank accounts which he still maintains.  Mr. Banerjee also maintained a house in Connecticut throughout the period from 2009 till early 2015 but only stayed at that address for short periods of time while he was visiting the area and used it for business purposes.  Hence, the address was not his permanent residence. The Plaintiff was aware of Mr. Banerjee's residential status and also was in possession of the address for Mr. Banerjee based on previous communications. The address that Mr. Banerjee has maintained and is his permanent residence since 2009 is 58/1 Ballygunje Cir Rd. Kolkata-19, West Bengal, India. Additionally, communication by and with the Massachusetts Courts had with Mr. Banerjee was directed to Mrs. Banerjee's email address and at the above stated address in India as demonstrated by the docket report included as (**exhibit A**).  Please see Exhibit M showing Mr. Banerjee's current car registration and insurance in Kolkata, India along with his permanent resident address.

24. Mr. Banerjee continues to be a permanent resident of India but travels a great deal for his business. Mr. Banerjee's in-laws resided at the address 304 Harvester Circle, Pittsburgh, PA 15241. They (Mr & Mrs Gandhi) have lived at that address for nearly 30 years. (please see exhibit P, land record) Mr. Banerjee's wife and family were temporarily living there while Mrs. Banerjee and her father built a new residence at 1514 Cook School in Pittsburgh, PA (please see exhibit Q land record). **Mr. Banerjee does not own or lease any residence in the United**

11

**States.** SG serving Mrs Banerjee at her fathers' residence (where she was staying temporarily)

does not constitute proper service under Rule 4.  Mr. Banerjee never lived there and only visited.

The PA residency rules are quite clear about residency statues and how to interpret them:

> You can have <u>only one domicile at any given time</u>. Your domicile does not change
> until you move to another state or country with the sincere intention of making
> your "new" permanent home there and abandoning your previous domicile.

> If an individual moved to another state or country, but intended to stay there only
> for a fixed or limited time (no matter how long), the domicile does not change.
> Once established in a locality or state, your domicile continues there until you
> establish a new domicile. It is not dependent upon continuous physical presence.
> It is not abandoned by absence or even by presence in a former domicile, no
> matter how long continued, if, in leaving and during the absence, there is no firm,
> sincere, unconditional intention of remaining in the other jurisdiction for an
> indefinite and uncertain period. ***For example, temporary absence from a new***
> ***domicile with presence in a former domicile for the purpose of transacting***
> ***business or for the sake of health, pleasure, or education, with a definite***
> ***intention of returning to the new domicile does not affect a person's domiciliary***
> ***status[2].***[emphasis added]

25. Residency requirements for the Commonwealth of Pennsylvania include

*§ 95.2. Residence requirements.*[3]

(a) *Resident defined.* A resident is a person who resides, and who has manifested the intent to
continue to reside in this Commonwealth or a former resident of this Commonwealth who meets the
criteria in paragraph (2)(i) or (ii).
   (1) Evidence of intent to continue to reside in this Commonwealth includes the following:
   (i) Rent, lease or purchase of a property which the applicant has made a primary residence in this
   Commonwealth.
   (ii) Payment of State and local taxes.
   (iii) Registration of personal property, such as bank accounts, stocks, and bonds and automobiles
   within this Commonwealth.
   (iv) Possession of a current Pennsylvania driver's license.
   (v) Current registration to vote in this Commonwealth.

26. Mr. Banerjee cannot answer in the affirmative to any of the requirements for PA residency

definition above. Mr. Banerjee has no bank accounts in Pennsylvania or anywhere in the United

---

[2] 2010 Commonwealth of Pennsylvania. https://revenue-pa.custhelp.com/app/answers/detail/a_id/272/~/how-do-i-know-if-i-am-a-resident-of-pennsylvania%3F.
[3] http://www.pacode.com/secure/data/004/chapter95/s95.2.html

12

States, owns no car, does not own or lease property in the United States and does not earn in the US or pay any State or local taxes. Banerjee has a business in India which requires him to travel a great deal and he does visit with his family in Pittsburgh a fair amount since early 2015 (after the home in CT was sold in 2015)

27. Additionally, receiving a traffic violation, does not constitute residency in any state. If that was the case, then there would be many of us with several residences outside our home state. The car that driven by Mr. Banerjee is owned by Mr. Gandhi (Mr. Banerjee's father-in-law). Please see exhibit R, registration of car that Mr. Banerjee was driving. Furthermore, Mr. Banerjee does not have a PA license.

28. For the benefit and ease of the Court, inserted below is a brief timeline of the events surrounding the two cases. The Plaintiff has repeatedly made misstatements and stated blatant lies regarding these cases and this chart below will help crystalize the timeline of events.

13

| Date | Critical Event | 13-cv-07355 | 14-cv-00913 |
|---|---|---|---|
| October 18,2013 | Plaintiff files Summons and Complaint | Plaintiff -Sadis & Goldberg Defendant- Sumanta Banerjee | NO CASE |
| November 5, 2013 | Plaintiff attempts to serves Akshita Banerjee in Pittsburgh in lieu of serving actual defendant- Sumanta Banerjee. Mr. Banerjee was not in PA. | Complaint and Summons were served incorrectly to wife not actual defendant. | NO CASE |
| January 17, 2013 | Case dismissed | Judge Swain dismisses case for lack of subject matter jurisdiction, | NO CASE |
| February 3, 2014 | Central Authority serves a dismissed case to Banerjee's mother | DISMISSED CASE | NO CASE |
| February 13, 2014 | SG file new case | DISMISSED CASE | NEW CASE FILED |
| February 19, 2014 | Counsel for Banerjee's mother return incorrectly served papers from a DISMISSED CASE | DISMISSED CASE | NO EFFECT ON THIS CASE |
| June 13, 2014 | SG *unsuccessfully* transmit to India's Central Authority second case | DISMISSED CASE | NEW CASE PAPERS WERE NEVER TRANSMITTED TO CENTRAL AUTHOITY OF INDIA. |
| July 3, 2014 | Honorable Laura Taylor Swain's Order dated July 3, 2014 states: "Plaintiff avers that, since instituting this action, it [Plaintiff] has undertaken every effort to effect service upon Banerjee including transmitting a second request to the Indian Central Authority." Furthermore the Hon. Judge unknowingly used the blatant lie made by Paulina Stamatelos of SG in her Declaration as basis for allowing electronic service. Banerjee was not even in India during that time and as such the papers could not have been "refused by recipient" (see Dr. Reba Banerjee and her counsel, Mr. Kundus Affidavits) | DISMISSED CASE | NO PROOF PROVIDED BY PLAINTIFF THAT ALL OTHER MEANS OF SERVICE WERE EXHAUSTED – IN FACT, JUDGE SWAIN WAS LIED TO. One phone call to Central Authority does not constitute all available means of Service. |

29. The Plaintiff's first case, 13-cv-7355(LTS) was started in October 2013. The dismissed case cannot

be served as a substitute for this case. Although the Plaintiff hired an investigator, the information

that the investigator provided to the Plaintiff was incorrect. The investigator concluded that

Banerjee was living in Pittsburgh, when in fact, Banerjee was still residing in India.

14

30. When the processor did not find Banerjee, he harassed and terrorized Banerjee's children upon their return from school for several days until he could serve the papers on Mrs. Banerjee as an alternate to serving Banerjee. The processor harassed Mr. Banerjee's family and forced Mrs. Banerjee to take the complaint papers by having the processor accompanied by the local police despite Mrs. Banerjee reiterating that Banerjee **does not** live in Pittsburgh. The next day, Mrs. Banerjee returned the papers to the Court and Hirsch based on advice of the Court. Mrs. Banerjee reiterated in the letter again, that Mr. Banerjee **does not** live at 304 Harvester Cir. Pittsburgh, PA 15241; the Plaintiff was well aware of Mr. Banerjee's residence in India. Mr. Banerjee had communicated (from India) with Hirsch in **early 2013 on a different matter** prior to the filing of the first lawsuit, filed in October of 2013. Banerjee had no agenda to ever avoid service as he signed the July 2008 Agreement in good faith and has shown the Court that he does not owe SG anything due to their material breach of the July 2008 Agreement.   He stood ready to sign the assignment agreement as long as it reflected the July 2008 Agreement and Pledge mechanism.

31. Mr. Banerjee was never served with papers from either case by the Central Authority. **Please see Exhibit S**, a filing of the Plaintiff's, document 8-2 Exhibit A, an email from Paulina Stamatelos, dated **May 01, 2014**, which says,

> "Given that we have yet to serve you by India's Central Authority, and you refuse to cooperate with us to agree to a preliminary pre-trial statement per the Court's Order that I have emailed and mailed you in March, do you agree to an adjournment of the May 16, 2014 Initial Conference Order?"

On June 12, 2014, Sadis filed a Certificate of Service purporting to show that the Complaint had been delivered to the address of Mr. Banerjee when in fact it had been delivered to Dr. Reba Banerjee ("Dr. R"), Mr. Banerjee's elderly mother. Additionally the papers that were given to Dr. R were not even the papers of the current case, 14-cv-913, they were papers of the previously dismissed case, as evidenced by the dates of the Central Authority receipt.

32. Further, it can be inferred by the time stamp that the package that the Plaintiff sent by FedEx in March 2014 to the Central Authority were the papers associated with the current case, of 14-cv-

913. Although the Plaintiff has NOT provided proof that the Central Authority ever delivered those papers to Banerjee. Furthermore, the Plaintiff has not provided any proof to the Court that they have made *every reasonable effort*, for at least 6 months, to obtain a Certificate of Service on the current case. Accordingly, the plaintiff has violated Article 15 of the Hague Convention. **Please see correspondence between the Plaintiff and Central Authority, included as Exhibit T, that shows clearly that the Plaintiff has only conversed with the Central Authority on June 4, 5, and 8 of 2014;** hardly the 6 months required by the Articles of the Hague Convention and hardly a "reasonable" effort after mailing the Central Authority on March 18, 2014 (less than three months). No proof of any further communication or "reasonable effort" to reach the Central Authority in India is shown anywhere in the Court filings. Finally, the Plaintiff, in their pleadings has made misstatements, causing the Court to incorrectly assume that the papers in the current were served to the Plaintiff.

33. Hirsch continues to grasp at straws to circumvent Hague Convention rules which govern Mr. Banerjee. The Plaintiffs' in their desperation are trying to use Mrs. Banerjees court battle with a contractor who worked on her and her father's house to prove Mr. Banerjee's permanent residence since Mr. Banerjee dealt with the contractor and was named in the matter.

34. Douglas Hirsch and his firm Sadis & Goldberg should face stiff penalties for gross misconduct and violation of ethics. The Plaintiff has not followed the Hague Convention Rules for Service Abroad, in this specific case and has misrepresented the facts in order to file a lawsuit in direct material breach of the July 2008 Agreement. Additionally, the declaration of service from the associate of Sadis is clearly a blatant attempt to mislead this Court—the package was never delivered and was returned to Sender as evident in the exhibits *of the Plaintiff*. The Default Judgment should also be vacated under Rule 60(b)(1)(2)(3) and the Court should dismiss all charges. Mr. Banerjee is a victim of this "unethical" law firm and its "unethical" partner Mr. Douglas R. Hirsch and the Court should recognize that it has been misled with all the ex parte communication from the Plaintiff and hopefully will set things right in the interest of Justice.

16

## I.   MEMORANDUM OF LAW

The Court must set aside the Default Judgment because it is void as a matter of law and dismissal is non-discretionary under Rule 60(b)(4). Default should also be set aside based on FRCP 55 (c) since Bnaerjee has shown "good cause" for default. Proper service of process is a critical prerequisite to the exercise of personal jurisdiction over Mr. Banerjee, and as India is a signatory to the Hague Convention and has expressly objected to service in any other manner, Mr. Banerjee respectfully submits that the Court had no authority to order any other form of service. Mr. Banerjee respectfully submits that the Court erred in allowing service via email because it based its decision on (1) Banerjee's address changed due to Mr. Banerjee's mothers affidavit. Mr. Banerjee's address remains the same as in the Massachusetts litigation – the person from Central Authority went to the incorrect address of his mothers' which is Flat 142B, 58/1 Ballygunje Circular Rd and NOT 58/1 Ballygunje Circular Rd. (2) As Mr. Banerjee has stated in his Affidavit, he has not used the "sbaner@gmail.com" email since early 2013 as it has become populated with spam and junk. The court in Massachusetts has not communicated with him on this email nor has Mr. Banerjee communicated with the Court via this email since 2012. Please see exhibit A, docket sheet of the Massachusetts Court that states the email that was used to communicate with the Court was *gandhibanerjee@gmail.com*. The Court was misled by the blatant lies of SG who put forth Affidavits that the Court in Massachusetts communicated at *sbaner@gmail.com*. As a result, Mr. Banerjee was unaware that service was effectuated into this email since it is an email that Mr. Banerjee does not use as a means of communication and has become populated with spam and junk. Mr. Banerjee had to use the PACER system to retrieve all the documents when he was alerted recently about this case and he fully intends to fight the case on its merits. (3) The Court has allowed service by email pursuant to Article 10 of the Hague Convention (that it specifically does not address email) and FRCP 4(f)(3). However, the Hague Convention is exclusive and compliance with the Hague Convention is mandatory in all cases that it applies to. As Mr. Banerjee is a resident of India, the Articles of the Hague Convention do apply to him. That is, so long as the party to be served is located in a member state and no exception applies (e.g., Article 1 provides an exception where the address of the party to be served in not known), service of judicial and extrajudicial

17

documents must be effectuated by means authorized under the Convention. Second, no provision under the Articles of the Hague Convention authorizes service by email.

In other words, the Court erred (probably due to SGs blatant lies regarding Mr, Banerjee's address) to find the Convention doesn't prohibit service by email, so it must be allowed under Article 10. Instead, service by such means is proper only if the Convention expressly permits it, and the only provision that might be seen as permitting such service is Article 10, which refers to "postal channels" (please bear in mind that the Convention was drafted in 1965 and was never amended, so it's no surprise it doesn't expressly refer to electronic mail), but India has formally objected to service under Article 10 in its entirety. Furthermore, Article 14 of the *Universal Postal Convention* defines "electronic mail" as "a postal service involving the electronic transmission of messages". This would fall under the "postal channel" that India has objected to in its entirety. Under Fed. R.Civ.P.4(f)3, Courts can authorize service of process by email in particular cases as long as international agreement does not forbid it. As discussed above, since India has objected to Article 10 in its entirety, the Court should not be able to take personal jurisdiction over Mr. Banerjee in this case via improper email service. Even if Banerjee agreed with the Court on email service, to an email recently used in the Mass Ct case, SG lied to the court that sbaner@gmail.com was used. In fact as docket sheet shows, in exhibit xxx, it was gandhibanerjee@gmail.com that was used. SG misled the court and hence served the email the old email that Mr. Banerjee did not use, as a result, service under FRCP 4(f)(3) was not effectuated properly by SG. Absent service of process, the judgment is void and must be vacated under Rule.60(b)(4). It was not a willful neglect. In addition, the Default Judgment itself violates Article 15 of the Hague Convention, rendering it void.

The Default Judgment also should be vacated under Rule 60(b)(1)(2)(3) in view of the Court's legal errors as a result of misrepresentations by the Plaintiff in all *ex parte* communication so far and Mr. Banerjee's mistake, inadvertence, surprise or excusable neglect of checking svaber@gmail.com. In addition, Mr. Banerjee has shown meritorious defenses since SG and Hirsch materially breached the July 2008 Agreement by not entering into the contemplated Pledge/Foreclosure Agreement or the Assignment Agreement by trying to obtain additional collateral in the form of Mr. Banerjee's personal Limited

18

Partnership interest in GDF Fund on top of the "agreed upon" collateral of converted GP Interest into

Special LP interest in the July 2008 Agreement.  This material breach on SGs part would render the July

2008 contract null and void since Mr. Banerjee stood ready in good faith to honor the July 2008 Agreement

and the Pledge or Assignment.

## I.   The Default Judgment Is Void For Lack of Service and Must Be Vacated.

### A.   A Judgment Based On Defective Service of Process Is Void.

Fed. R. Civ. P. 60(b)(4) requires a void judgment to be set aside:

> The governing principles are that a default judgment issued without
> jurisdiction over a defendant is void, that it remains vulnerable to being
> vacated at any time, and that such jurisdiction depends on the proper
> service of process or the waiver of any defect.

*M & K Welding, Inc. v. Leasing Partners, LLC*, 386 F.3d 361, 364 (1st Cir. 2004).  *See also*

*Shank/Balfour Beatty v. IBEW Local 99*, 497 F.3d 83, 94 (1st Cir. 2007)("When judgment is entered

against an entity never properly served as a party to the case, the judgment is 'void' within the meaning of

Rule 60(b)(4).")

Proper service of process is a prerequisite to the exercise of personal jurisdiction:

> Before a federal court may exercise personal jurisdiction over a defendant,
> the procedural requirement of service of summons must be satisfied. ...
> [T]here must be more than notice to the defendant and a constitutionally
> sufficient relationship between the defendant and the forum. There also must
> be a basis for the defendant's amenability to service of summons. Absent
> consent, this means there must be authorization for service of summons on
> the defendant.

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987) (quotation omitted).  *See also*

*Jardines Bacata, Ltd. v. Diaz-Marquez*, 878 F.2d 1555, 1559 (1st Cir.1989) ("the district court acquires

jurisdiction over a defendant only by service of process...."); *Williams v. Jones*, 11 F.3d 247, 254–55 n.11

(1st Cir. 1993) (vacating judgment and remanding for service of process).

Once service is challenged, it is the plaintiff's burden to prove proper service.  *Rivera-Lopez v.*

*Municipality of Dorado*, 979 F.2d 885, 887 (1st Cir.1992).  Actual knowledge of the lawsuit is insufficient.

19

*Omni Capital* 484 U.S. at 104; *Precision Etchings & Findings, Inc. v. LGP Gem, Ltd.*, 953 F.2d 21, 24 (1st Cir.1992).

Absent proper service, the court lacks jurisdiction, and any judgment is void.  Unlike other Rule 60(b) grounds, a motion under Rule 60(b)(4) leaves no room for discretion:  if the judgment is void, the Court must set it aside.  *Echevarria-Gonzalez v. Gonzalez-Chapel*, 849 F.2d 24, 28 (1st Cir. 1988); *See also* 11 Wright, Miller & Kane, *Federal Practice & Procedure* § 2862 (2d ed.) ("Either a judgment is void or it is valid [and] … when that question is resolved, the court must act accordingly.").  The Plaintiff has yet to serve Mr. Banerjee pursuant to Rule 4 or pursuant to Article 15.  Serving an old practically defunct email under FRCP (4)(f)(3)(sbaner@gmail.com) is not proper service when they knew that Mr. Banerjee was using gandhibanerjee@gmail.com in ongoing Massachusetts litigation (which settled in 2015) and blatantly lying to the Court about exhausting all means of available service (when they did not attempt to serve the current case papers through Central Authority other than two phone calls) and then moving to serve under FRCP(4)(f)(3) in under three months.  Plaintiff again lied by claiming "receipient refused delivery" in [March 2014] when Mr. Banerjee was not even in India.

### B. The Hague Convention is Exclusive and Mandatory.[4]

Where process must be served abroad and the foreign nation is a signatory, the Hague Convention provides the mandatory and exclusive methods of service:

> Article 1 defines the scope of the Convention, which is the subject of controversy in this case. It says: "The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." . . . This language is mandatory, as we acknowledged last Term in *Société Nationale Industrielle Aérospatiale v. United States District Court*, 482 U.S. 522, 534, n. 15 . . . (1987).... Schlunk does not purport to have served his on VWAG in accordance with the Convention. Therefore, if service of process in this case falls within Article 1 of the Convention, the trial court should have granted VWAG's motion to quash.

---

[4] The Hague Convention and India's formal reservations described below are attached as Exhibit B.

*Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988). *See also id.* at 706 ("Those who eschew its procedures risk discovering that the forum's internal law required transmittal of documents for service abroad, and that the Convention therefore provided the exclusive means of valid service.").

In *Société Nationale*, the Court contrasted the mandatory language of the Hague Convention with that of the Hague Convention on Taking Evidence Abroad in Civil or Commercial Matters and concluded that the latter was neither exclusive nor mandatory:

> As noted, *supra*, at 7, **the Service Convention** was drafted before the Evidence Convention, and its language **provided a model exclusivity provision** that the drafters of the Evidence Convention could easily have followed had they been so inclined. Given this background, the drafters' election to use permissive language instead is strong evidence of their intent.

482 U.S. at 533-34 (emphasis added).

The D. Mass Court has similarly held that service abroad in signatory states must comply with the treaty. *See, e.g., Tabb v. Journey Freight Internations*, 584 F. Supp. 334, 340 (D. Mass. 2008) ("It is undisputed that … to make effective service in a country that has joined the Hague Convention, a plaintiff must follow the provisions of the treaty.")(internal quotation omitted).

Similarly, in *Marcantonio v. Primorsk Shipping Corp.*, 206 F.Supp.2d 54 (D. Mass. 2002), the court vacated a default judgment where the plaintiff personally delivered the complaint to the ship's captain and the company's counsel. The court held that Rule 4(f)(1) required service under the Hague Convention and rejected the view that Rule 4(f)(2)(C)(i) authorized personal service. 206 F. Supp. 2d at 57-58 (quoting Advisory Committee Notes to 1993 Amendments to Rule 4(f)). The court refused to order alternate service under Rule 4(f)(3):

> Nor is Marcantonio's alternative proposal, that this Court should ratify his attempt to serve Primorsk by mailing process to Primorsk's attorneys, convincing. …The Advisory Committee Notes on the provision state:
>
> Paragraph (3) authorizes the court to approve other methods of service not prohibited by international agreements. The Hague Convention, for example, authorizes special forms of service in cases of urgency if convention methods will not permit service within the time required by the circumstances.... [Under some circumstances], the court may direct a special method of service not explicitly authorized by international agreement if not prohibited by the agreement.

21

*Id.* at 58.  The court held that, absent such urgency, Rule 4(f)(3) was inapplicable.  *Id.* at 58-59.

Sadis & Goldberg and Douglas Hirsch did not comply with the Hague Convention by not serving Mr. Banerjee at his correct address and instead serving his mother at her address. Also, it needs to be pointed out, that the documents that must have been served to Dr. Reba Banerjee, due to the date stamp of December 2013 from the Central Authority was case no 13-cv-7355 (cased filed in Oct 2013) (which was dismissed without prejudice) and not Case no. 14-cv-913 (current case filed on 2/13/2014).  Plaintiff says they mailed current case to Central Authority in March (process takes six to nine months in India) but explains that that proper service would take time—which is no justification at all and moved to Court for Service under Fed. Rule 4(f) (3). *See Furukawa Elec. Co. v. Yangtze Optical Fibre & Cable Co.*, 2005 WL 3071244 (D. Mass. 2005) (that Hague Convention service may be "burdensome and expensive" does not excuse compliance). Plaintiff has not suggested that its claims were so urgent that "convention methods will not permit service within the time required by the circumstances."  In fact, the Plaintiff has waited five (5) years to file this lawsuit, and hence cannot make a case for urgency.

In view of Plaintiffs failure to serve Mr. Banerjee under the Hague Convention, Mr. Banerjee submits that the Court erred as a matter of law by ordering Plaintiff to serve via "electronic mail." (Order of July 2014.) Also, Court was misled with wrong email address of sbaner@gmail.com when Mr. Banerjee communicated with Court (and email and permanent address of record ) were gandhibanerjee@gmail.com and 58/1 Ballygunje Circular Rd (Mr. Banerjees permanent address).

### C. Even If Rule 4(f)(3) Applied, Neither Email Nor FedEx Are Permissible Methods of Service Under Rule 4(f)(3).

Even if the Hague Convention did not preempt Rule 4(f)(3), neither electronic  mail nor service via Fedex were permitted because both are "prohibited by international agreement."  Specifically, India has registered an objection to Article 10(a) of the Hague Convention, which permits "sending" judicial documents via postal channels provided that the receiving state does not object.  "India is opposed to the methods of service provided in Article 10."[5]  Service via DHL is within the scope of Article 10(a) and is

---

[5] Available at: http://hcch.e-vision.nl/index_en.php?act=status.comment&csid=984&disp=resdn.

also prohibited.  Compare *Mones v. Commercial Bank of Kuwait, S.A.K.*, 502 F. Supp. 2d 363, 370-71 (S.D.N.Y. 2007) (DHL service prohibited where signatory objected to Art. 10), and *RSM Prod. Corp. v. Fridman*, 2007 WL 1515068, at *2 (S.D.N.Y. May 24, 2007) (same, for FedEx), *with EOI Corp. v. Med. Mktg. Ltd.*, 172 F.R.D. 133, 143 (D.N.J. 1997) (DHL is permitted service by mail where signatory has not objected), *and R. Griggs Group Ltd. V. Filanto Spa*, 920 F. Supp. 1100, 1103 (D. Nev. 1996)(same, for FedEx). *Cf. Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 384 (5th Cir. 2002) (Art. 10 did not permit service of process by mail at all); *Intelsat Corp. v. Multivision TV LLC*, 2010 WL 3368655, at *7 (S.D. Fla. Aug. 24, 2010) (same).[6]  The Court has allowed service by email pursuant to Article 10 of the Hague Convention (that it specifically does not address email) and FRCP 4(f)(3). However, the Hague Convention is exclusive and compliance with the Hague Convention is mandatory in all cases that it applies to.  That is, so long as the party to be served is located in a member state and no exception applies (e.g., Article 1 provides an exception where the address of the party to be served in not known), service of judicial and extrajudicial documents must be effectuated by means authorized under the Convention. Second, no provision under the Articles of the Hague Convention authorizes service by email.  In other words, the Court erred (probably due to SGs lies and misrepresentations) to find the Convention doesn't prohibit service by email, so it must be allowed under Article 10.  Instead, service by such means is proper only if the Convention expressly permits it, and the only provision that might be seen as permitting such service is Article 10, which refers to "postal channels" (please bear in mind that the Convention was drafted in 1965 and was never amended, so it's no surprise it doesn't expressly refer to electronic mail), but India has formally objected to service under Article 10 in its entirety.  Furthermore, Article 14 of the *Universal Postal Convention* defines "electronic mail" as "a postal service involving the electronic

---

[6] Whether Art. 10 even authorizes service of process through the mail as opposed to merely "sending" non-process documents is unclear, but the only authority in this District holds that it does not.  *See Golub v. Isuzu Motors*, 924 F. Supp. 324, 327 (D. Mass. 1996) (noting split of authority but holding service of process by mail not authorized). *See also Nuovo Pignone, supra,*; *Bankston v. Toyota Motor Corp.*, 889 F.2d 172, 174 (8th Cir. 1989) (service by registered mail not permitted); *Cooper v. Makita, U.S.A., Inc.*, 117 F.R.D. 16, 17 (D. Me. 1987) (same).

23

transmission of messages". This would fall under the "postal channel" that India has objected to in its entirety. Under Fed. R.Civ.P.4(f)3, Courts can authorize service of process by email in particular cases as long as international agreement does not forbid it. In *Agha vs Jacobs* (N.D. Cal 2008) service by email is inconsistent with the Hague Convention. As discussed above, since India has objected to Article 10 in its entirety, the Court should not be able to take personal jurisdiction over Mr. Banerjee in this case via improper email service. According to this Honorable Courts Memorandum and Order dated July 2014, "Constitutional notions of due process require that any means of service be reasonably calculated, under all circumstances, to appriseinterested parties of the pendency of the action and afford them an opportunity to present their objections." S.E.C. vs Anticevic, No. 5 CV 6991 (KMW), 2009 WL 361739, at *4 (S.D.N.Y. Feb 13, 2009) (internal quotation marks and citation omitted). Even if Mr. Banerjee agreed with the Court on email service, Mr. Banerjee is sure the Court was intentionally misled by Sadis and Goldberg by providing the court with the incorrect email (sbaner@gmail.com and not the correct one listed at the Court, see Exhibit A). This Court also wrote in the same Order that "service by email alone comports with due process where a plaintiff demonstrates that the email is likely to reach the defendant," (FTC v Pecon Software Ltd., 2013 WL4016272, at *5 (citing cases). Mr. Banerjee rarely used the sbaner email and hence the Massachussetts Court had Gandhibanerjee@gmail.com. Mr. Banerjee had not used the sbaner@gmail.com for at least one and half years and any Service of Summons/Complaint could not reach Banerjee nor did he have any notice on the pendency of the action in an old almost defunct email address. International service via email may not satisfy due process concerns in situations where there is a reasonable chance the email would never reach the defendant. In *Ehrenfeld v. Salim A Bin Mahfouz*[7] (in the U.S. District Court for the Southern District of New York) the court refused to authorize email service because the defendant's email address was "apparently only used as an informal means [of communication]," and thus was not a reliable enough channel of communication to ensure that the defendant would receive the email.[8] In this case, Ehrenfeld had not persuaded the court that Bin Mufouz

---

[7] No. 04 Civ 9641(RCC), 2005 WL 696769, at *3(S.D.N.Y. Mar.23, 2005).
[8] *Id.* at *4.

24

maintains the website on which the e-mail was found, that he checks that e-mail account, or that he would be likely to receive information transmitted to that e-mail address. The court found that the e-mail address was used only as an informal means of accepting requests for information rather than for receiving important business communications. Courts reaching conclusions similar to those reached in Ehrenfeld have done so based on the defendants' infrequency of use, rather than on the logic that electronic communications are uniquely unreliable.

I would hope in the interest of justice the Court would recognize it was misled by Sadis and ordered service to the incorrect email and vacate the default judgment. Absent service of process, the judgment is void and must be vacated under Rule 60(b) (4).

### D. The Default Judgment Is Void under Article 15 Of The Hague Convention.

In addition, Mr. Banerjee respectfully submits that the Default Judgment itself violates the Hague Convention, rendering it void. Article 15 strictly limits the availability of default judgments. The first paragraph of Article 15 provides that a default judgment "shall not be given until it is established that" either (a) the document was served "by a method prescribed by the internal law" of the recipient state for service in domestic actions (as specified in Article 5(a) of the treaty), or (b) that the document was actually delivered "by another method provided for by this Convention." (Hague Convention, Art. 15(a) – (b).) Both sections require service through a method specified by the treaty – either service by the Central Authority itself in a manner prescribed by that country's internal law as specified in Article 5(a), or by "another method" specified in the treaty (*e.g*, voluntarily via diplomatic/consular agents (Art. 8), using diplomatic/consular channels to forward complaint to Indian authorities (Art. 9), or Art. 10, if the recipient state does not object – as India has).[9] Neither of these applies as Mr. Banerjee was never served at his

---

[9] There is little authority interpreting Article 15, which might be read as permitting a default judgment if the complaint is served in a manner prescribed by the internal law of the recipient country for domestic litigation, even if not done by that country's Central Authority under Art. 5(a). Such an interpretation is implausible and would undermine the treaty by permitting default judgments where a plaintiff made no effort to comply but instead took it upon itself to serve the defendant as if it were being served in domestic litigation. Rather, section (a) of the first paragraph of Art. 15 must be read in conjunction with Art. 5(a), consistent with the reference in the next section to "another method" specified by the treaty.

residence and the Plaintiff merely sent the documents to the Indian central Authority in March 2014 and moved the Court in June 2014 (less than three months later) to serve Mr. Banerjee via email under FRCP 4(f)(3) in clear violation of Article 15 (Exhibit B).

The second paragraph of Article 15 provides an "escape hatch" in case the pertinent Central Authority fails to serve the document, but only if _each_ of three conditions are fulfilled:

> a) the document was transmitted by one of the methods provided for in this Convention,
>
> b) a period of time of not less than six months, considered adequate by the judge in the particular case, has elapsed since the date of the transmission of the document,
>
> > c) no certificate of any kind has been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed.

(Hague Convention, Art. 15, 2d ¶.)  This paragraph plainly does not apply in this matter.

First, Plaintiff stated that Indian Central Authority served Mr. Banerjee's mother (with court documents in January 2014 which had to be the 13-cv-7355 case) and then Plaintiff supposedly mailed the documents in March 2014 to the Indian Central Authority to serve Mr. Banerjee through the Hague Service Convention, a process known to take up to nine months or more (after they were returned by Mr. Banerjees Mothers counsel ( see Exhibit G & H affidavit of Dr. Reba Banerjee and Mr. Kundu, Dr. Banerjee's counsel)).  Plaintiff then moved the Court to serve by alternate means via email in June 2014 without waiting for six months as required by Article 15.  Plaintiff has not asserted that they routinely followed up and "exhausted all reasonable means" on the Complaint to the Indian Central Authority under the treaty, and it has produced no evidence to support such a conclusion.  Notably, the Plaintiffs' Affidavits in Support of the Request for Entry of Default does not mention that Mr. Banerjee was ever served by the Central Authority as required by the Hague Convention. Furthermore, Ms. Stamatelos, email to the Central Authority in Exhibit T shows that they had not been able to service Banerjee as required by the Hague Convention.

26

Second, absent evidence that the Plaintiff transmitted the Complaint under the treaty and of the date it purportedly did so (March 2014), the Court may not find that not less than six months has elapsed prior to moving for FRCP 4(f) (3).

Third, Plaintiff has not asserted that it made any effort at all to obtain the required proof of delivery, let alone that it made "every reasonable effort." In *Universal Trading & Inv. Co. v. Kiritchenko*, 2007 WL 660083 (N.D. Cal. Feb. 28, 2007), the plaintiff attested that he transmitted the complaint to the Antiguan Central Authority on August 2, 2000, and had "made various efforts to obtain the Certificates." The Court held that because he had not identified those "various efforts" beyond a single telephone call, the plaintiff had not expended "every reasonable effort" and therefore had not satisfied each requirement of Article 15. *Id.* at \*3 - \*4. In the current case, 14-cv-913, the Plaintiff has not asserted that they had made any effort, in fact, simply that that the process would take too long and so asked the Court to move that it was served because the Plaintiff had sent the documents to the Central Authority.

Accordingly, as Plaintiff has failed to satisfy any of the prerequisites to a default judgment under Article 15, the Hague Convention prohibited (and continues to prohibit) entry of the Default Judgment. It is, therefore, void and must be set aside under Rule 60(b)(4).

**E.    The Court Should Vacate the Default Judgment Under Rule 60(b)(1) Because The Court Erred In Awarding Plaintiff the Amount of $383,448.90**

1.    <u>The Court incorrectly awarded Plaintiff Amount despite July 2008 Pledge Agreement which settles the invoice And The Court Was Required to Hold a Hearing ;</u>

The Court was misled by Sadis' intentional omission of the clause within the July 2008 Agreement that allowed Banerjee to pledge his portion of the incentive fees to Hirsch as payment in full for the legal fees owed to the Plaintiff. Also, Sadis is in material breach, a fact not known to the Court.  Sadis & Goldberg and Hirsch intentionally omitted to advise the Court of the Pledge Agreement which essentially allows the Defendant to "zero out" the invoice balance by allowing the Plaintiff to foreclose on his converted GP interest into LP interest in the GDF Fund. This process was agreed upon in the Agreement with Mr. Banerjee's signature and despite the emails from Mr. Hirsch that he would be sending a foreclosure

27

notice to foreclose on the LP Interest, he never did. Instead he chose to file his baseless and meritless lawsuit

to recover his fees when the mechanism to do that has already been contractually agreed upon in the July

2008 Agreement without any notice of the clauses of that Agreement that allowed Hirsch to foreclose.

2.   The Court May Correct Its Mistake Of Law Under Rule 60(b)(1).

Rule 60(b)(1) allows relief from a judgment on the basis of "mistake, inadvertence, surprise, or

excusable neglect." The First Circuit has held that, in the context of *non*-default judgments, Rule 60(b)(1)

may not be used to correct a court's mistake of law. *Silk v. Sandoval*, 435 F.2d 1266, 1267-68 (1st

Cir.1971). Other Courts of Appeal have held otherwise. *E.g.*, *United Airlines, Inc. v. Brien*, 488 F.3d 158,

175 (2d Cir. 2009); *Benson v. St. Joseph Regional Health Center*, 575 F.3d 542, 547 (5th Cir. 2009); *Pierce*

*v. United Mine Workers of Am.*, 770 F.2d 449, 451 (6th Cir. 1985); *Parks v. U.S. Life & Credit Corp.*, 677

F.2d 838, 839 (11th Cir. 1982). More recently, however, the First Circuit has suggested that, in the case of

default judgment damage awards, a court may correct its error under Rule 60(b)(1).

> If *Silk* is correct about the limited scope of Rule 60(b) and so are the courts
> that say that Rule 59(e) may not be used to challenge a default judgment,
> then a party in default would never be able, by motion in the district court,
> to bring to that court's attention an error of law in the default judgment. Of
> course, the party could appeal the judgment to the court of appeals, but it
> would be odd and inefficient to preclude the party in default from first
> seeking relief based on error of law from the district court. ... That particular
> problem would be exacerbated if, as happened here, the defaulted party also
> failed to appear at the hearing on the amount of the default judgment. In such
> circumstances, the defaulting party could never get a hearing before the
> district court on its argument that the amount embodied in the default
> judgment is based on an error of law. That might make sense as a strong
> medicine to encourage parties not to default, but it also could lead to
> uncorrected basic legal errors.

*Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 189 (1st Cir. 2004).

Mr. Banerjee respectfully submits that, under *KPS*, the First Circuit will conclude that the failure

to hold an evidentiary hearing was an abuse of discretion and will vacate and remand for a proper

determination. As the *Venegas-Hernandez* court observed, this would be inefficient and would deprive the

Court of its ability to correct legal errors. If the Court does not vacate the Default Judgment as being void,

Mr. Banerjee asks that it vacate under Rule 60(b)(1) and hold the Plaintiff to its burden of proving why they

28

have not foreclosed on the collateral as set out in the July 2008 Pledge Agreement and "settles" the invoice. Of course, Hirsch was well aware that they would have to wait till the end of the partnership to collect the collateral (Incentive compensation) and "zero-out" the invoice.

### F.   The Default Judgment Should Be Vacated Under Rule 60(b)(1)  On The Basis Of Mr. Banerjee's Mistake, Inadvertence, Surprise, Or Excusable Neglect.

Whether or not the Court ultimately agrees with Mr. Banerjee's position on service of process and voidness, he was completely unaware of the lawsuit or the Default Judgement since he was never served the papers.   His mother being served the old dismissed case papers by Central Authority mistakenly and his wife being served the old dismissed case papers does NOT constitute proper service. He was completely taken unaware and surprised when he found out recently about the Case 14-cv-913 in the Pacer System. Mr. Banerjee did not use the sbaner email account and had not used that account to communicate with the Plaintiff for over 10 months. If the Court should disagree, Mr. Banerjee's failure to appear and defend was inadvertent, surprise, a good faith mistake, and due to excusable neglect, Rule 60 (b) (1).   Additionally, Rule 60 (b)(2)(3) should also apply here since the Court was unaware of the Pledge Agreement in the July 2008 Agreement (new evidence) due to the misrepresentation and omission committed by Sadis & Goldberg and Hirsch upon the Court and Mr. Banerjee  by intentionally NOT making the Court aware of the clause of the Pledge Agreement which "zeroes out" the Invoice of the Plaintiff through the mechanism agreed upon by BOTH parties in 2008. The July 2008 Agreement was drafted by Sadis. The Plaintiff has violated the July 2008 Agreement by filing this suit and has dealt in bad faith with Mr. Banerjee.

Courts addressing Rule 60(b) motions consider various factors: (i) timeliness; (ii) exceptional circumstances; and (iii) the absence of unfair prejudice to the other party.   *Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co.*, 953 F.2d 17, 20 (1st Cir. 1992). The moving party must provide "reason to believe that vacating the judgment will not be an empty exercise" by showing that it has a "potentially meritorious claim or defense." *Id.* at 21.   The court "should assume the truth of fact-specific statements contained in a Rule 60(b)[] motion and determine whether these facts, as alleged, warrant relief." *Marderosian v. Shamshak*, 170 F.R.D. 335, 338 (D. Mass. 1997).

29

Mr. Banerjee's motion is clearly timely. Rule 60(c)(1) sets a one-year limit for motions under Rule 60(b)(1), but otherwise requires only that they be filed within a reasonable time. Mr. Banerjee is filing this Motion immediately after learning of the Default Judgment from a friend and this memorandum is being filed as soon as he could complete it. Due to extremely short time frame in which to file these motions, Mr. Banerjee was forced to defend his position on a *pro se* basis. Exceptional circumstances exist because Mr. Banerjee was seriously prejudiced by the Plaintiffs refusal to comply with the Hague Convention (for this case having simply mailed this case to the Central Authority and moved the Court to serve a "defunct email address" in less than three months). In view of his *pro se* status, his diligence in making his arguments, and the preference for resolving matters on the merits, it would be a serious miscarriage of justice to deprive Mr. Banerjee of his right to defend. *See, e.g., Triestman v. Fed. Bur. of Prisons*, 470 F.3d 471, 471 (2d Cir. 2006) ("implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.").

Sadis & Goldberg, a big law firm (who never foreclosed on the Collateral agreed upon to settle the Invoice for 5 years from 2008-2013 when they initiated the first dismissed lawsuit 13-cv-7355) will suffer no "unfair prejudice" if the Default Judgment is vacated and the case proceeds along the ordinary course. Moreover, Sadis & Goldberg is responsible for any delay, as it has deliberately chosen to bypass the Hague Convention procedures for this Case 14-cv-913. The Supreme Court warned against precisely this in *Schlunk*, 486 U.S. at 706 ("Those who eschew its procedures risk discovering that the forum's internal law required transmittal of documents for service abroad, and that the Convention therefore provided the exclusive means of valid service.").

Furthermore, Mr. Banerjee has meritorious defenses. Mr. Banerjee and Sadis & Goldberg signed the Pledge Agreement (part of the July 2008 Agreement) where the Mr. Banerjee negotiated the mechanism to "zero out" the Invoice. As mentioned previously the July 2008 Agreement was drafted by Sadis. The Email conversation between Mr. Hirsch and Mr. Banerjee in April and October of 2009 further shows that Mr. Banerjee was following the July Agreement and Mr. Hirsch had told him " the collateral is mine now"

30

and " I am on vacation now and will send the Foreclosure Agreement". It should also be clear to the Court

that Hirsch wanted to renegotiate the July 2008 Agreement and was not satisfied with what he wanted in

July 2008 – the converted GP interest of Mr. Banerjee in Special LP interest. Please also note the rest of

the conversation "Exhibits, I-N". Mr. Banerjee has clearly demonstrated to the Court that Hirsch never

intended to "honor" the agreement based on his failing to meet the timelines of sending the Pledge

Agreement or the Foreclose on the Pledge Agreement for non-payment (which Mr. Banerjee had clearly

told him was going to be the case and Mr. Hirsch had to foreclose to get paid from the collateral. However,

the Court can see from the communication between Mr. Banerjee and Mr. Hirsch that he was trying to

overreach for additional collateral and materially breached the July 2008 Agreement.  Count I (Account

Stated), Count II (Goods Sold and Delivered), Count III (Breach of Contract), Count IV (Unjust

Enrichment) and Count V(Quantum Meruit) are all related to nonpayment of the Invoice which is part of

the July 2008 Agreement. However, Mr. Hirsch material breach of the July 2008 Agreement may render it

null and void as per basic contract Law since Mr. Banerjee is non-breaching party.  Mr. Banerjee maintains

that the Pledge Agreement was structured with a mechanism to foreclose on the collateral in order to settle

the invoice and as a result all the Counts are baseless and meritless.  Mr. Banerjee is not in breach of any

agreement, it is Mr. Hirsch who is in material breach.  Mr. Hirsch never foreclosed on the collateral and

could have gotten paid with the Collateral as agreed upon in the July Agreement.  Mr. Hirsch it seems was

dealing in bad faith all the time due to his actions and has been needlessly wasting the Courts time and

money.  Mr. Banerjee stands ready to litigate this baseless and meritless lawsuit with his meritorious

defenses and is hopeful that the Court will allow him the opportunity to defend himself vigorously as he

intends to do and counterclaim the Plaintiff as well.

### G.  Rule 55(c) To Set Aside Default

Mr. Banerjee moves this court to set aside the default entered against him, and thereby preclude an

entry of Default Judgment against it pursuant to Fed. R. Civ. P. 55(c). Fed. R. Civ. P. 55(c) provides that

"for good cause shown the court may set aside an entry of default" by the Clerk of Court. Fed. R. Civ. P.

55(c). In applying Rule 55(c) and deciding whether to set aside an entry of default, the district court

31

exercises its discretion, "applying a standard of liberality and resolving all doubts in favor of the defaulting party." Metlife Capital Credit Corp.,1992WL 346772, at *2; In re Arthur Treacher's Franchise Litig., 92 F.R.D. 398, 415 (E.D.. Pa. 1981).

The following factors are considered when deciding whether to set aside an entry of default: (i) whether the plaintiff will be prejudiced if the default is lifted; (ii) whether the defendant has a meritorious defense; and (iii) whether the default was a product of the defendant's culpable or inexcusable conduct. See, Duncan v. Speach, 162 F.R.D. 43, 44 (E.D.Pa. 1995) (motion for default judgment and motion to set aside entry of default); Metlife Capital Credit Corp. v. Austin Truck Rental of Allentown, Inc., 1992 WL 346772 (E.D. Pa. 1992)(motion to set aside entry of default); Accuweather, Inc. v. Reuters Ltd., 779 F. Supp. 801, 802 (M.D. Pa. 1991) (motion to set aside entry of default).

Also undermining plaintiff's position is the second factor in the analysis, which asks whether the defendant has available a meritorious defense. The requisite standard does not require the defendant "to prove beyond a shadow of a doubt that it will win at trial, but merely to show that it has a defense to the action which as least has merit on its face." Emasco Ins. Co. v. Sambrick, 834 F. 2d 71, 74 (3d Cir. 1987). Banerjee includes several facially valid defenses including material breach on part of the Plaintiff with respect to the July 2008 Contract. Because such defenses possess at least the appearance of validity, they are sufficient to meet the "meritorious defense" requirement.

Finally, regarding the third factor of culpable conduct on the part of the defendant, a motion to set aside a default should not be granted if the defendant "exhibited bad faith or if such conduct was part of a deliberate trial strategy." Mr. Banerjee never received the email service due to bad faith on part of Plaintiff by serving the old sbaner@gmail and lying to the Hon. Court that the old email was used in the Massachussetts litigation when in fact it was gandhibanerjee@gmail.com. As a result, Mr. Banerjee never received service and did not know about default judgment. SG tried to serve him at his mother's address and his father in law's address but not to his address. Metlife Capital Credit Corp., 1992WL 346772, at *3 (citing International Brotherhood of Electrical Workers v. Skaggs, 130 F.R.D. 526 (D.Del. 1990)). The defendant's conduct does not rise to the level of "culpable" here. Culpable conduct in the Third Circuit is

32

dilatory behavior that is willful or in bad faith. See Gross v. Stero Component Sys., Inc., 700 F. 2d 120, 124 (3d Cir. 1983); Metlife Capital Credit Corp.,1992 WL 346772, at *2; Stevens, 1991WL270092. Such conduct is not inferred from the default itself but must appear independently on the record. Spurio v. Choice Sec. Sys., Inc., 880 F. Supp. 402, 405 (E.D. Pa. 1995).

## CONCLUSION

For the foregoing reasons, Mr. Banerjee requests that the Court: (i) vacate the Default Judgment; (ii) set aside the Entry of Default against him; and (iii) order Sadis & Goldberg LLC to promptly serve the Complaint (in this case) in accordance with the Hague Convention or have its Complaint dismissed for lack of service and/or Material Breach of Contract by Plaintiff of July 2008 Agreement or Order a Status Conference where Mr. Banerjee could participate via telephone.

DATED: August 8, 2016

Respectfully Submitted,
SUMANTA BANERJEE
*pro se*
58/1 Ballygunje Cir Road
Kolkata-700019
West Bengal
India
Email: zbacllc@gmail.com

33

## Cases

*Bankston v. Toyota Motor Corp.*, 889 F.2d 172 (8th Cir. 1989) .......................................... 23

*Benson v. St. Joseph Regional Health Center*, 575 F.3d 542 (5th Cir. 2009) ......................... 28

*Brand Scaffold Builders, Inc. v. Puerto Rico Elec. Power Auth.*, 364 F. Supp. 2d 50 (D.P.R. 2005) ...................................................................................................................................... 3

*Cooper v. Makita, U.S.A., Inc.*, 117 F.R.D. 16 (D. Me. 1987) ............................................... 23

*Echevarria-Gonzalez v. Gonzalez-Chapel*, 849 F.2d 24 (1st Cir. 1988) ................................ 20

*EOI Corp. v. Med. Mktg. Ltd.*, 172 F.R.D. 133 (D.N.J. 1997) .............................................. 23

*Furukawa Elec. Co. v. Yangtze Optical Fibre & Cable Co.*, 2005 WL 3071244 (D. Mass. 2005) .................................................................................................................................... 22

*Golub v. Isuzu Motors*, 924 F. Supp. 324 (D. Mass. 1996) .................................................. 23

*Intelsat Corp. v. Multivision TV LLC*, 2010 WL 3368655 (S.D. Fla. Aug. 24, 2010) ........... 23

*Jardines Bacata, Ltd. v. Diaz-Marquez*, 878 F.2d 1555 (1st Cir.1989) ................................ 19

*M & K Welding, Inc. v. Leasing Partners, LLC*, 386 F.3d 361 (1st Cir. 2004) ...................... 19

*Marcantonio v. Primorsk Shipping Corp.*, 206 F.Supp.2d 54 (D. Mass. 2002) ............... 21, 22

*Marderosian v. Shamshak*, 170 F.R.D. 335 (D. Mass. 1997) ............................................... 29

*Mones v. Commercial Bank of Kuwait, S.A.K.*, 502 F. Supp. 2d 363 (S.D.N.Y. 2007) .......... 23

*Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374 (5th Cir. 2002) ..................... 23

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987) .............................. 19, 20

*Parks v. U.S. Life & Credit Corp.*, 677 F.2d 838 (11th Cir. 1982) ....................................... 28

*Pierce v. United Mine Workers of Am.*, 770 F.2d 449 (6th Cir. 1985) .................................. 28

*Precision Etchings & Findings, Inc. v. LGP Gem, Ltd.*, 953 F.2d 21 (1st Cir.1992) .............. 20

*R. Griggs Group Ltd. V. Filanto Spa*, 920 F. Supp. 1100 (D. Nev. 1996) ............................ 20

*Rivera-Lopez v. Municipality of Dorado*, 979 F.2d 885 (1st Cir.1992) ................................. 19

*RSM Prod. Corp. v. Fridman*, 2007 WL 1515068 (S.D.N.Y. May 24, 2007) ........................ 23

Rule 60(b) ............................................................................................................................ 29

*Shank/Balfour Beatty v. IBEW Local 99*, 497 F.3d 83 (1st Cir. 2007) ................................. 19

*Silk v. Sandoval*, 435 F.2d 1266 (1st Cir.1971) ................................................................... 28

*Société Nationale Industrielle Aérospatiale v. United States District Court*, 482 U.S. 522 (1987) ................................................................................................................................. 20, 21

*Tabb v. Journey Freight Internations*, 584 F. Supp. 2d 334 (D. Mass. 2008) ...................... 21

*Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co.*, 953 F.2d 17 (1st Cir. 1992) ....................................................................................... 29

*Triestman v. Fed. Bur. of Prisons*, 470 F.3d 471 (2d Cir. 2006) ......................................... 30

*United Airlines, Inc. v. Brien*, 488 F.3d 158 (2d Cir. 2009) ................................................ 28

*Universal Trading & Inv. Co. v. Kiritchenko*, 2007 WL 660083 (N.D. Cal. Feb. 28, 2007) ...... 27

*Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183 (1st Cir. 2004) ............................... 28

*Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694 (1988) ........................ 20, 21, 30

*Williams v. Jones*, 11 F.3d 247 (1st Cir. 1993) ................................................................... 19

## Other Authorities

Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ................................................................... *passim*

## Rules

Advisory Committee Notes to 1993 Amendments to Rule 4(f) .............................................. 21

34

Fed. R. Civ. P. 4(f)(2)(C)(i) ........................................................................................ 21
Fed. R. Civ. P. 60(b) ...................................................................................... 3, 17, 18, 19
Rule 60(b)(1) ............................................................................................. 27, 28, 29, 30
Rule 60(c)(1) ........................................................................................................ 30

**Treatises**

11 Wright, Miller & Kane, *Federal Practice & Procedure* § 2862 (2d ed.) .............................. 20

35