# EXHIBIT 19

1        - Sumanta Banerjee - Confidential -

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------- X

5    SADIS & GOLDBERG, LLP,              )

6                  Plaintiff,            )

7         -vs-                           )

8    SUMANTA BANERJEE,                   )

9                  Defendant.            )

10   -------------------------------- X

11

12   DATE:  February 14, 2019

13   TIME:  9:39 a.m.

14

15             CONFIDENTIAL DEPOSITION OF SUMANTA

16   BANERJEE, held at the offices of Sadis & GOldberg,

17   New York, New York, pursuant to Notice, before

18   Hope Menaker, a Shorthand Reporter and Notary

19   Public of the State of New York.

20

21

22

23

24

25

## Page 2

```
 1         - Sumanta Banerjee - Confidential -
 2      A P P E A R A N C E S
 3      SADIS & GOLDBERG, LLP
 4      Attorneys for the Plaintiff
 5           551 Fifth Avenue - 21st Floor
 6           New York, New York  10176
 7      BY:  BENJAMIN HUTMAN, ESQ.
 8
 9      FERBER CHAN ESSNER & COLLERT LLP
10      Attorneys for the Defendant
11           One Grand Central Place
12           60 E. 42nd Street Suite 2050
13           New York, New York  101766
14      BY:  ROBERT N. CHAN, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1         - Sumanta Banerjee - Confidential -
 2              IT IS HEREBY STIPULATED AND AGREED by
 3      and among the attorneys for the respective parties
 4      hereto, that the sealing and filing of the within
 5      deposition be waived.
 6
 7              IT IS FURTHER STIPULATED AND AGREED
 8      that all objections, except as to the form, are
 9      reserved to the time of trial.
10
11              IT IS FURTHER STIPULATED AND AGREED
12      that the within examination and any corrections
13      thereto may be signed before any Notary Public
14      with the same force and effect as if signed and
15      sworn to before this Court.
16
17
18
19
20
21
22
23
24                       -o0o-
25
```

## Page 4

```
 1         - Sumanta Banerjee - Confidential -
 2              SUMANTA BANERJEE, called as a
 3      witness, having been duly sworn on February
 4      14, 2019, by a Notary Public, was examined
 5      and testified as follows:
 6                   58/1 Ballygunje Circular Road
 7                   Kolkata, West Bengal, India
 8
 9   EXAMINATION BY MR. HUTMAN:
10      Q.    Good morning, Mr. Banerjee.
11      A.    Good morning.
12      Q.    Is this the first deposition that
13   you've sat for?
14      A.    No, I had another one.
15      Q.    Just one?
16            I'll reask it.  You had just one
17   other one?
18      A.    Correct.
19      Q.    So I'm just going to go over quickly
20   some of the basic rules of a deposition.
21            I'm going to ask questions.  You're
22   going to answer the questions.  Please be careful
23   to answer questions verbally, not nod your head up
24   or down --
25      A.    Right.
```

## Page 5

```
 1         - Sumanta Banerjee - Confidential -
 2      Q.    -- that won't show up on the record.
 3            It's important to answer the question
 4   verbally.  It's also important to wait for me to
 5   finish asking the questions before you start to
 6   speak or the record gets confusing.
 7            I will do my best to have you fully
 8   answer the question before I ask the next
 9   question.
10      A.    Okay.
11      Q.    From time to time your attorney may
12   object to the question that I ask.  If your
13   attorney objects to the question I ask, you still
14   have to answer it unless he instructs you not to
15   answer.
16      A.    Okay.
17      Q.    The objection doesn't mean you don't
18   answer, it's for the purposes of preserving his
19   objections for the future.
20      A.    Okay.
21      Q.    Okay.  If you need a break at any
22   time, as long as you answer the question that's
23   currently pending --
24      A.    Right.
25      Q.    -- I'll be glad to give you a break.
```

Page 18

1        - Sumanta Banerjee - Confidential -
2     another apartment?
3        A.     They had another apartment in the
4     same building when my father was around.
5        Q.     What was the number of that one?
6        A.     It was 50 -- I'm going to say 55-B.
7     To the best of my recollection they were renting
8     it when we moved into their apartment.
9        Q.     Let me -- I don't quite have the
10    arrangement.
11       A.     So let me just clarify.  So when we
12    moved to India, we moved into their apartment
13    which was 142-B.  The two of them rented another
14    apartment in the same building complex and I think
15    the number was 55-B --
16       Q.     Okay.
17       A.     -- if I remember, but I could be
18    wrong.
19       Q.     Did there ever come a time that your
20    parents moved back into 142-B?
21       A.     Correct.
22       Q.     When was that?
23       A.     They moved back when we left for
24    Delhi.  Delhi is also a family house.
25       Q.     Can you give me your employment

Page 19

1        - Sumanta Banerjee - Confidential -
2     history from 2008 through the present?
3        A.     '8 -- '8 I was -- I was a partner, 50
4     percent owner of a bunch of funds with Tuckerbrook
5     Alternative Investments.  I don't think they exist
6     anymore.  2009 I was an advisor, a senior advisor
7     to Srei and Shristi group of companies in India.
8     It's a big conglomerate.
9        Q.     And after?
10       A.     That was 2009 'til about 2011, to the
11    best of my recollection.  And after that I worked
12    exclusively for the family trust.
13       Q.     So from sometime in 2011 to the
14    present you've worked exclusively for the family
15    trust?
16       A.     Correct.  Prior to that I was also
17    working with the family trust but my dad really
18    managed it until he was around, and he passed away
19    in 2010.  After that, I started working with the
20    family trust exclusively, really.
21              And I also had from 2010 to '11, I
22    also was with SREI Group and the Shristi Group but
23    I had to give that up.
24       Q.     What's the name of the family trust?
25       A.     It's a long name.  It's Salil,

Page 20

1        - Sumanta Banerjee - Confidential -
2     S-A-L-I-L, Raba, R-A-B-A, I think it's
3     S-A-S-S-A-B, this is to the best of my
4     recollection -- Trust 2010.  This is as much as I
5     can recall.  It's a long one.
6              MR. CHAN:  I know we provided you
7          with the name.
8        Q.     The names of the trust that you
9     provided me, is the same trust you're referring
10    to?
11       A.     Correct.
12       Q.     There's only one trust?
13       A.     There's only one trust.
14       Q.     Did you contribute any money to that
15    trust?
16       A.     Yes, I did.
17       Q.     How much money did you contribute?
18       A.     I don't recall exactly.  A lot of
19    money.
20       Q.     Can you ballpark it?
21       A.     In the millions.
22       Q.     Do you remember what year or years
23    you contributed that money?
24       A.     It's sort of a difficult question to
25    answer because it was from a long time I used to

Page 21

1        - Sumanta Banerjee - Confidential -
2     gift money to my parents and they kept it in
3     various accounts and they put it all into the
4     trust.  So I can't tell you for --
5        Q.     You say for a long time.  Over what
6     period of time?
7        A.     '90s, 2000s.
8        Q.     So you contributed money -- you
9     gifted money to yours parent from the '90s through
10    2010?
11       A.     'Til I would say two thousand and --
12    yeah, '9, '10 even.
13       Q.     Then they put all their money into
14    the trust?
15       A.     Correct.
16       Q.     Did your parents also put money into
17    the trust from their own source of income?
18       A.     Yeah, my family is independently
19    wealthy.  So, yes.  They -- it's multiples of my
20    money.
21       Q.     You received distributions from time
22    to time from the trust, correct?
23       A.     As I said before, I -- it's my mother
24    gifts it to me, so I don't know how you want to
25    call it.  It's from the trust, I guess, but my

Page 62

1     - Sumanta Banerjee - Confidential -
2     A.    I'm trying to recall, it's such a
3  long time ago.  I had transferred some money to my
4  father and we needed to get some of that back to
5  actually pay Mr. Hirsch.  And it was difficult
6  because of India's regulations, and I believe it
7  had to be in the form of a loan to an entity.  So
8  an entity had to be formed and the house was put
9  into it.
10            So -- that's what I sort of vaguely
11 remember.  It's been a long time.
12    Q.    When you say the house was put into
13 it, do you mean the 23 Soundview Farm house was
14 transferred to ZBAC LLC?
15    A.    Correct, it was.
16    Q.    Why did you transfer that house to
17 ZBAC LLC?
18    A.    Well, that loan had to be secured by
19 something and that was the house that was going to
20 take a second lien on the house.
21    Q.    Why did the loan have to be secured
22 by something?
23    A.    That's the rules of India to get
24 money.
25    Q.    Why couldn't you have used the system

Page 63

1     - Sumanta Banerjee - Confidential -
2  that you're using now where you just withdraw
3  money from an account?
4     A.    Five hundred dollars a day to pay Mr.
5  Hirsch?
6     Q.    It was just inconvenient?
7     A.    Yes.
8     Q.    At that time were you withdrawing
9  money from an Indian account for your ordinary
10 everyday expenses?
11    A.    2008?
12    Q.    Yes.
13    A.    No.
14    Q.    When did you start using this
15 withdrawing money as-you-needed-it method for
16 having cash on hand?
17    A.    After we moved to India we -- I had
18 transferred all my assets to India.
19    Q.    Why did you transfer all your assets
20 to India?
21    A.    Because we never intended to come
22 back to the U.S.
23    Q.    Whose Adam Chodus?
24    A.    He was the lawyer that helped set up
25 ZBAC.

Page 64

1     - Sumanta Banerjee - Confidential -
2     Q.    Did he do any other work for you?
3     A.    Not really, I don't recall.
4     Q.    Did there come a time where you were
5  trying to transfer all of your assets out of your
6  personal name?
7     A.    All of my assets, I recall, were --
8  in 2008, jointly owned with my wife.  And I
9  transferred it because we were going to move to
10 India at the time.
11    Q.    When you transferred it to India, did
12 you transfer it to India in your name or did you
13 transfer it to some entity in India?
14    A.    I suppose we were advised, I gifted
15 it all to my parents.
16    Q.    You were confident that your parents
17 would then gift you out money as you needed it
18 thereafter?
19    A.    I did trust my parents.  I'm the only
20 child, so there is no one else.
21    Q.    That's a good reason.
22            What was the reason why you chose to
23 move to India?
24    A.    My dad wasn't doing well and the
25 doctors had pretty much said it was a matter of

Page 65

1     - Sumanta Banerjee - Confidential -
2  time and I wanted to spend some time with my dad.
3             And -- and somebody had to manage all
4  the family assets.
5     Q.    I believe earlier you said that you
6  moved to India in January of 2009; is that right?
7             MR. CHAN:  Objection.
8     A.    I believe so.
9             MR. HUTMAN:  I'm going to show you a
10 document we'll mark as Exhibit 2.
11            (Whereupon, Exhibit 2 was marked at
12 this time.)
13    Q.    Mr. Banerjee, do you recognize the
14 document that has been marked as Exhibit 2?
15    A.    E-mails to Doug.
16    Q.    E-mails between you and Mr. Hirsch?
17    A.    Yes.
18    Q.    If you go to the second page of the
19 document to the earliest in time e-mail that you
20 sent on August 28th, 2009, at 11:00 p.m.
21            Do you see that e-mail?
22    A.    Yes.
23    Q.    You write, "Doug, I'm definitely not
24 back in September.  It will be October sometime.
25 Not sure on the date, several balls up in the

Page 86

- Sumanta Banerjee - Confidential -

2  And you said SBaner@gmail.com and
3  then you said Sumanta.Banerjee1@gmail.com?
4  A.  Yes.
5  Q.  When you were asked to collect
6  documents in this case, you searched both of those
7  e-mail addresses?
8  A.  Yes.
9  Q.  Do you still --
10 A.  And I believe so.  I mean, I can't
11 remember if I used this Sumanta.Banerjee1 because
12 I haven't really used that for ever.
13     I mean, this is a long time back.
14 Q.  And he also asks you about e-mail
15 addresses that you used in connection with your
16 job.  Do you see that?
17 A.  Yes.
18 Q.  And you said that you had a couple.
19     Do you see you list two e-mail
20 addresses there?
21 A.  Uh-huh.
22 Q.  Do you know if you searched those
23 e-mail addresses in response to the document
24 requests that we served you in this case?
25 A.  I don't have access to those.

Page 87

- Sumanta Banerjee - Confidential -

2  Q.  If you turn to the page ending Bates
3  number 311, which is Page 81 of the deposition
4  transcript.  Would you turn to that page?
5  A.  Which one?
6  Q.  81.
7  MR. CHAN:  81.
8  Q.  You see line 16 -- actually, if you
9  go back to Line 13, he asks you about Exhibit 14.
10     He says, "Thank you.  And that was
11 July 23rd, 2008?"
12     Do you see that?
13 A.  Exhibit.
14 Q.  The word Exhibit 14?
15 A.  Yes.
16 Q.  He says, "And that was July 23rd
17 2008?"
18     Do you see that?
19 A.  Okay.
20 Q.  Then he asks you at Line 16:  "My
21 question to you is in the weeks leading up to that
22 document Exhibit 14, did you hire an asset
23 protection specialist named Adam Chodus?"
24     Do you see that?
25 A.  Yes.

Page 88

- Sumanta Banerjee - Confidential -

2  Q.  You see your answer on Line 21:  "He
3  was an attorney for estate planning and he was I
4  think asset protection was one of his specialties
5  that he did."
6  A.  Yes.
7  Q.  This is the same Adam Chodus that I
8  asked you about earlier today?
9  A.  I don't.
10 Q.  You said he gave you some advice with
11 respect to transferring the 23 Soundview Farm
12 house to the ZBAC LLC?
13 A.  Right.
14 Q.  He also advised you about the
15 formation of ZBAC LLC?
16 A.  Yes.
17 Q.  Did he also advise you about the
18 general transferring of your assets to India, to
19 your family in India?
20     MR. CHAN:  Yes or no.
21 A.  No.
22 Q.  Did someone else advise you about the
23 general transferring of your assets to your family
24 in India?
25 A.  Not that I could recall.

Page 89

- Sumanta Banerjee - Confidential -

2  MR. HUTMAN:  I'm going show you a
3  document that we're going to mark as Exhibit
4  5.
5  (Whereupon, Exhibit 5 was marked at
6  this time.)
7  Q.  Mr. Banerjee, do you recognize the
8  document that's been marked as Exhibit 5?
9  A.  Yes.  I guess.
10 MR. CHAN:  Do you or don't you?
11 THE WITNESS:  I do.
12 Q.  And this is an e-mail exchange
13 between you and your wife; is that correct?
14 A.  Looks like it.
15 Q.  Taking place in June on June 26 of
16 2008; is that right?
17 A.  Looks like it.  Yes.
18 Q.  You see at the top e-mail which is
19 sent from your wife's e-mail address,
20 GhandiBanerjee@gmail.com to your e-mail address
21 SBaner@gmail.com.
22     Do you see that?
23 A.  Yup.
24 Q.  She says, "Adam said yes have to
25 disclose but no assets are there.  We meet him at

Page 90

1     - Sumanta Banerjee - Confidential -
2    2:30."
3            Do you see --
4        A.   Okay.
5        Q.   And then she says, "At Capricio."  Is
6    that what that says?
7        A.   Yes.
8        Q.   What is Capricio?
9        A.   Capricio is a little Italian cafe in
10   Connecticut.
11       Q.   So she's describing that you're going
12   to be meeting with Adam at that cafe at 2:30?
13       A.   Yes.
14       Q.   So she said "Adam said yes have to
15   disclose."
16            Do you see that?
17       A.   Yes.
18       Q.   So then you respond at 12:48 p.m. --
19            MR. CHAN:  I'm going to object to and
20   direct him not to answer questions as to his
21   conversations with counsel.
22            I think there's a joint privilege
23   between her and him -- and well, obviously,
24   I'm concerned about privilege.
25            MR. HUTMAN:  I'm not going to ask him

Page 91

1     - Sumanta Banerjee - Confidential -
2    about his communications with counsel.  I'm
3    just going to ask him about communications in
4    this document.
5            MR. CHAN:  They seem --
6            MR. HUTMAN:  Between him and his
7    wife.
8            MR. CHAN:  They seem to relate to
9    communications with counsel and they have a
10   joint privilege.  I'll listen to the
11   questions but understand my sensitivity.
12           MR. HUTMAN:  I understand your
13   sensitivity.  This is a publicly filed
14   document, just to put that out there.  This
15   was filed as part of a lawsuit.  I got this
16   off PACER.
17       Q.   Okay.  So you respond at 12:48 p.m.
18   to your wife and you write, "So why the hell did
19   he do it in a way that we have to disclose?  I
20   thought the entire idea was to protect it and keep
21   it confidential that we do not have any assets."
22            Do you see that?
23       A.   I guess, yeah.
24       Q.   What did you mean when you said, "I
25   thought the entire idea was to protect it and keep

Page 92

1     - Sumanta Banerjee - Confidential -
2    it confidential that we do not have any assets"?
3        A.   I don't know.  I don't recall at all.
4        Q.   Is it possible that you meant that
5    you were trying to do something in a way that
6    would make it appear that you didn't have any
7    assets?
8            MR. CHAN:  Objection.
9        A.   I really don't recall.  As I had said
10   before, we had sent a lot of cash overseas and we
11   were trying to get it back.
12       Q.   Was one of the purposes of sending
13   that cash overseas so that you could make it
14   appear as if you did not have assets?
15       A.   No, it was done before any of this
16   actually happened.  That's what I recall.  And I
17   was trying to get it back.  That's what I
18   remember.
19            And Adam was -- I really don't
20   recall.  It's just been way too long.
21       Q.   Well, let me ask you to use your
22   abilities of reading comprehension at the moment.
23       A.   Yes.
24       Q.   Reading this right now --
25           MR. CHAN:  Objection.

Page 93

1     - Sumanta Banerjee - Confidential -
2        Q.   Reading this right now, do you
3    understand this message that you sent to your wife
4    when you wrote, "I thought the entire idea was to
5    protect it and keep it confidential that we do not
6    have any assets" to have been referring to some
7    attempt to make to --
8        A.   I --
9        Q.   Let me finish the question.
10       A.   Yeah.
11       Q.   I'm going to start from the top.
12            Reading this document right now, this
13   e-mail --
14       A.   Yes.
15       Q.   -- do you understand this message
16   that you sent your wife where you said, "I thought
17   the entire idea was to protect it and keep it
18   confidential that we do not have any assets," to
19   be referring to some attempt to keep confidential
20   the existence of some assets?
21           MR. CHAN:  Objection.
22       A.   I don't know.  I don't know.  Again,
23   I'm not supposed to guess so I'm not really going
24   to guess.
25       Q.   I'm going to ask if you were reading

Page 94

1    - Sumanta Banerjee - Confidential -
2    this as an objective person, just reading it right
3    now, I'm not asking you about your memory, I'm
4    asking you reading it right now as an objective
5    person, do you understand this message to be
6    referencing an attempt to keep confidential the
7    existence of some asset?
8            MR. CHAN:  Objection.
9            Did you qualify him as an expert in
10   interpreting the English language?  You're
11   asking him for an expert opinion.
12           MR. HUTMAN:  No, no, I'm asking him
13   for common ordinary reading comprehension
14   that anybody has sort of experience with
15   financial matters.
16           MR. CHAN:  Note my objection.
17           Witness may answer.
18       A.   The e-mail below says there is no
19   cash.  That's my -- I think my wife saying to me.
20       Q.   I'm talking about the e-mail before,
21   12:48 p.m., the previous e-mail in time.
22       A.   I mean, the assets that she's -- or
23   someone or I'm referring to, obviously, has got
24   nothing to do with cash.  So I don't know what
25   assets those are.

Page 95

1    - Sumanta Banerjee - Confidential -
2        Q.   That wasn't my question.  So I want
3    to go back and read you the question just a
4    second.
5            MR. HUTMAN:  Could we just have the
6    objection noted on the record already so we
7    don't need to have the objection again.  I'm
8    worrying he's going to have trouble
9    understanding me when I ask the question.
10       A.   This is 11 years ago, you understand
11   that.
12       Q.   I'm not asking about 11 years ago,
13   I'm asking you about now.
14           MR. CHAN:  We agree about the
15   continuing objection.
16           MR. HUTMAN:  I'll have that same
17   objection can go for the entire document.
18           MR. CHAN:  Okay.
19       Q.   Reading this document now, do you
20   understand your statement, "I thought the entire
21   idea was to protect it and keep it confidential
22   that we do not have any assets," to be referencing
23   an attempt to keep confidential the existence of
24   some assets?
25       A.   I have no idea.  I guess that's what

Page 96

1    - Sumanta Banerjee - Confidential -
2    it is.  I don't know.
3        Q.   Do you have any reason sitting here
4    today to believe that that statement was not
5    referring to the keeping of -- keeping the
6    existence of assets confidential?
7        A.   I don't know.  I really don't know.
8        Q.   So you have no reason to believe that
9    it means anything other than keeping assets
10   confidential?
11       A.   Again, I cannot tell you anything
12   about it.  It's 11 years ago.
13       Q.   So then the answer is that you have
14   no reason -- I'm just asking you to follow along.
15           Is it not true that you have no
16   reason to believe that it means anything other
17   than an attempt to keep the existence of some
18   assets confidential?
19       A.   It's something.  I don't know what it
20   is.  It's not cash.  We didn't have cash at that
21   point.
22       Q.   I'm not asking about cash.  I'm
23   asking about some assets.
24       A.   And what I recall is we were meeting
25   with Adam to figure out a way to get this cash

Page 97

1    - Sumanta Banerjee - Confidential -
2    back by using something, some asset as collateral
3    which was the requirement.
4        Q.   I'm not asking about your
5    recollection of other things you did with Adam,
6    all I'm asking --
7        A.   I think I've already answered.
8        Q.   Okay.  After you went back to 58/1
9    Ballygunje and you used the -- you had that
10   agreement, that guest agreement, did you continue
11   to use the 142-B address also?
12       A.   So, I stayed in the guest
13   accommodation most of the time and whenever I was
14   in Kolkata, and that was my address, but I
15   probably did spend a night or two at my mother's.
16   I don't know.
17       Q.   I believe you testified earlier that
18   you had the 142-B address on some of your official
19   Indian documents; is that correct?
20       A.   Correct.
21       Q.   And did you maintain that address on
22   official Indian documents after June 2011?
23       A.   Yeah, I never bothered to change any
24   of them because it's not an easy process and we
25   had all the official Indian documents were done

Page 126

1     - Sumanta Banerjee - Confidential -
2     Q.     If you look down in Paragraph 9, you
3     see title, Child support?
4     A.     Yes.
5     Q.     It says, "The parties have agree to
6     child support in the amount of $3,000 monthly
7     which is based on spousal agreement."
8             Do you see that?
9     A.     Yes.
10    Q.     Then in the next paragraph, it says,
11    "Child support payments will commence the first
12    day of the month following the entry of the
13    divorce decree."
14            Do you see that?
15    A.     Yes.
16    Q.     Was there ever a divorce decree
17    between you and your wife?
18    A.     No.
19    Q.     Did you ever file this separation
20    agreement with any court?
21    A.     Not that I remember.
22    Q.     You said not that I recall?
23    A.     Not that I recall, yes.
24    Q.     Did you ever make such $3,000 monthly
25    payments for child support?

Page 127

1     - Sumanta Banerjee - Confidential -
2     A.     It was probably in excess of that. I
3     don't know exactly.
4     Q.     Let me ask the question a little
5     differently.
6             Did you ever make lump sum payments
7     on a monthly basis to your wife for the purposes
8     of child support?
9     A.     It was given -- no, I did not make
10    exactly $3,000 payments. I gave her credit card
11    and a bank card.
12    Q.     I want to quickly turn to Paragraph
13    14. Turn to Paragraph 42, page ending with Bates
14    number 487.
15            See that paragraph?
16    A.     Yes.
17    Q.     It says, "Spousal Support/Alimony."
18    A.     Yes.
19    Q.     You see it says, "To be decided, once
20    the document is submitted to the Court"?
21    A.     Right.
22    Q.     Then it says, "Spousal support
23    payments shall be paid no later than the November
24    1, 2012 day of the month"?
25    A.     Right.

Page 128

1     - Sumanta Banerjee - Confidential -
2     Q.     So I believe you testified earlier
3     that the document was never submitted to the
4     Court?
5     A.     Correct.
6     Q.     Does that mean that you never made
7     spousal support payments?
8     A.     I -- as I said before, I gave her as
9     much money that she needed. Did not
10    necessarily -- it wasn't like $3,000. If she
11    needed $3,500, that was there for her. If she
12    needed -- we didn't separate necessarily spousal
13    support and child support. We basically said
14    whatever you need, I will provide for the kids and
15    you.
16    Q.     And even though the agreement seems
17    to contemplate child support after divorce decree
18    and spousal support after the filing of this
19    agreement with the Court, you gave child support
20    despite there -- or support of some kind, child or
21    spousal, despite there never being a divorce
22    decree and never having this agreement submitted
23    to a Court; is that correct?
24    A.     Correct.
25    Q.     So would it be fair to say that the

Page 129

1     - Sumanta Banerjee - Confidential -
2     support that you did give your wife and children
3     wasn't pursuant to this agreement?
4             MR. CHAN: Objection.
5     A.     It was pursuant to this agreement but
6     I gave her as much support that she needed.
7     Q.     What I'm trying to say -- pursuant is
8     probably not the right word.
9             Is it fair to say that the support
10    that you gave your wife and children was not
11    because of an obligation created by this
12    agreement, but rather was from the goodness of
13    your heart?
14            MR. CHAN: Objection.
15    A.     It was based on the obligation but I
16    wasn't going to limit it to $3,000. If she needed
17    more, she could have more. If she needed $5,000
18    for herself and the kids, I was going to provide
19    $5,000.
20    Q.     Well, I guess part of my confusion is
21    because if you read -- when I read the child
22    support, it says; "Child support payments will
23    commence the first day of the month following the
24    entry of the divorce decree."
25            Here, there was no divorce decree so